# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00164-CV

### C. C., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 315,071-B, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

C.C. (Mother) appeals from the trial court's decree terminating her parental rights to her six children: Margaret, Sam, Nancy, David, Madison, and Ryan.[1] Mother complains about the legal and factual sufficiency of the evidence supporting the trial court's findings about statutory-predicate grounds for termination and the children's best interests. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). For the following reasons, we affirm the termination decree.

## PROCEDURAL BACKGROUND

In January 2020, the Texas Department of Family and Protective Services removed all six children from Mother and Father M.'s home and filed an "Original Petition in Suit Affecting the Parent-Child Relationship—Termination Petition and/or Managing Conservatorship." The

---

[1] For the children's privacy, we refer to them by pseudonyms and to their family members by their relationships to them. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. The trial court's decree also terminated the parental rights of the children's respective fathers (Father L.—father of Margaret, Sam, Nancy, and David—and Father M.—father of Madison and Ryan and husband of Mother), but neither father has appealed.

children were then twelve (Margaret), eleven (Sam), nine (Nancy), eight (David), four (Madison), and three (Ryan). In the removal affidavit accompanying the Department's petition, the Department investigator averred that in December 2019 the Department was investigating reports of physical abuse of Sam by Mother, the children's primary caregiver.

According to the affidavit, law enforcement was called to the family's home after Margaret ran to a neighbor's house stating that Mother was "trying to smash her brother's face into the wall." Father M. was not home but Mother and the children were. Sam "was observed by Law Enforcement to have several marks and injuries on his face" that "were fresh" and had "dried blood on the side of his face by his ear." The home appeared "disgusting," "filthy," and "dirty," and it "smelled like [f]eces." Sam told the investigator that Mother caused his injuries by "pushing him down into a corner because he would not stay still" and "slammed him down to the ground and put her knee on his back to attempt to hold him down." Margaret told the investigator that Mother "does this all the time to [Sam]," "does drugs in front of them," and "uses methamphetamines." Mother was arrested for child endangerment and incarcerated in Bell County Jail. In an interview with the Killeen Police Department, Mother admitted to "physically disciplining [Sam]" and that "all her children have mental health conditions and [physical discipline] is the only way that she knows how to control them." She also admitted to using methamphetamine but denied using in front of the children.

The Department investigator averred about the family's lengthy CPS history. In 2013, Mother received five years' probation for a felony child-endangerment conviction after the Department became involved with the family while investigating a report that Mother had bitten Sam on a "lower extremity" because the child "was hungry." In 2015, the Department received a report that Mother was neglectfully supervising then-newborn Madison and "exhibiting erratic

2

and bizarre paranoid behavior that is believed to be indicative of mental illness." At that time, the Department had "concerns" that Mother was "unable to care for children" in part because she had "sent four children to live with the maternal grandmother in Maine." Mother had been incarcerated until "shortly before newborn [Madison]'s birth," and the Department removed Madison from the home but later returned her to Mother and Father M. after they completed required family services. In 2016, the Department received an allegation that Mother was "mentally unstable" because she had reported that her hospital room was haunted and that she "heard voices." After Mother explained to the Department that she had been "joking" and recanted her statement about hearing voices, the "allegations were ruled out and the case was closed."

In 2018, the Department investigated the family again, citing allegations of the children's prior "sexual acting out behaviors," Mother's mental-health diagnoses (including bipolar disorder), the children's diagnoses and special needs (including ADHD, bipolar disorder, and autism), Mother's illegal drug use and prior noncooperation with Maine CPS, and Mother's "absconding from Maine with the children" without informing Maine CPS of her whereabouts. Despite these concerns, the case was "ruled out" because the "[a]buse and [n]eglect did not occur in Texas." Nonetheless, there was "considerable concern that lead [sic] the case to be transferred to Family Based [Safety] Services [(FBSS)] in October 2018." Mother "reluctantly participated" in FBSS, and neither she nor Father M. "consistently took advantage of any of the offered services" such as counseling, daycare, and substance-abuse assistance. Further, Mother "did not allow the children to receive counseling" and was "combative" during the FBSS period. When the Department investigated the December 2019 allegation of Mother's abuse of Sam, it received reports of Sam riding a bicycle in cold weather wearing only a t-shirt and underwear and David

3

being sent to school in a sweater that "smelled of urine." The investigator's affidavit also summarized detailed family CPS history from Maine and Vermont spanning 2008 to 2012.

After Mother was arrested in December 2019, the Department implemented a safety plan with Father M. but shortly thereafter received reports that the children were physically fighting and harming each other and that Father M. was improperly supervising them, leaving them alone for over an hour on at least one occasion during which the children physically injured one another. The investigator's affidavit noted that the children were "not taking prescribed medication" or receiving "any mental treatment" despite each having ongoing mental-health and behavioral problems. After investigating the reports of Father M.'s inadequate supervision, the Department removed the children from the home and filed its petition.

A final hearing before an associate judge occurred in January 2021, after which the associate judge determined that all three parents' rights to the children should be terminated. Father M. requested a de novo hearing, and the district court conducted the de novo hearing in February 2021.[2] *See* Tex. Fam. Code § 201.015 (addressing de novo hearing before referring court); *see also In re A.L.M.-F.*, 593 S.W.3d 271, 280 (Tex. 2019) (noting that de novo hearing is "an extension of the original trial on the merits" and "[i]ssues not specified [by party requesting hearing] need not be reviewed"). After the de novo hearing, the district court adopted all of the associate judge's rulings and rendered a "De Novo Decree of Termination" on April 14, 2021. Mother timely filed a notice of appeal.

---

[2] Mother did not request a de novo hearing. Father L., although served and duly and properly notified, never appeared in the case and defaulted.

# SUMMARY OF EVIDENCE

*Final hearing*

At the final hearing, Department conservatorship worker Courtney Robinson and Father M. testified, and the trial court admitted into evidence the removal affidavit, Mother's and Father M.'s family service plans, the results of a drug-test performed on a urine specimen taken from Mother in April 2020, an affidavit supporting the Department's 2015 removal of the children,[3] the Department's January 2021 final report to the court, Mother's 2015 psychiatric evaluation performed by Dr. Samuel Shapiro, and reports summarizing psychological evaluations of Mother and Father M. performed in April 2020 by Dr. James N. Shinder. Court-appointed counsel represented Mother at the final hearing, but Mother was incarcerated and did not appear.

Robinson testified about the children's current placements and any special needs they had: Margaret was in a foster home and had no specialized needs; Sam was in a residential treatment center working to address his difficulty with focusing, aggression, and reluctance to communicate; Nancy was in a therapeutic family foster home working to decrease the amount and intensity of her "outbursts"; David was in a foster home working on decreasing his "outbursts" through therapy; and Madison and Ryan were in a foster home together where they were both doing well and had no special needs.

---

[3] In this earlier removal affidavit, the Department investigator averred that Mother had "admitted to smoking marijuana while pregnant with [Madison]" and that Mother's probation "was revoked because of her admitted marijuana use." Also, Mother by her "own admission" had "diagnosed mental health problems that she is currently not being treated for" and had "caused physical injury to one of her children at a young and vulnerable age" for which injury Mother did not seek treatment. Also, Margaret and Sam had "severe case[s] of lice that had been untreated for months despite [Mother] being provided with lice treatment."

Robinson testified that Mother was presently incarcerated with a pending felony charge for injury to a child and had a prior conviction for injury to a child. Mother had been released on bond for the current charge and had lived with Father M. during that time but in April 2020 tested positive for methamphetamine on a Department-ordered drug test and was returned to jail for violating her bond. Robinson testified that there were "significant portions" of this case during which Mother was not incarcerated and could have completed the requirements in her court-ordered family service plan. However, Mother completed only a psychological evaluation and an OSAR (outreach, screening, assessment, and referral for issues related to substance abuse). Among requirements Mother did not complete were the following: successful discharge from individual counseling, supervised visitation with the children, abstaining from use of illegal drugs, submitting to weekly drug tests, and following the recommendations outlined in her psychological evaluation.

Robinson explained that the Department's permanency plan for all six children was non-relative adoption. Although it was unlikely that they would all be adopted by one family, and none of the children were yet in a foster home that was available to adopt them, the Department was hopeful that at least some of the children might be adopted together, especially the youngest two. Robinson testified that although the children had "severe" aggression and discipline issues when they came into the Department's care, each of them had been able to "decrease their behaviors" in the time they had been in foster homes and therapeutic settings, which are "healthy environments." She believed that the children would have a "strong possibility of being adopted" as their issues continued to be addressed in their placements. She explained that although the two youngest were in therapy, they did not have any "behavior issues" that might prevent them from being adopted.

6

The guardian ad litem opined that termination of the parents' rights would be in the children's best interests and would prevent the children from "languishing in the system until they turn 18." She explained that the children had made "amazing progress" while in the Department's care.

*De novo hearing*

At the de novo hearing, Robinson testified similarly as to how she did at the final hearing and additionally that the children "need protection from their mother." Father M. testified that he had been present when Mother "disciplined" two of the children by spanking them on two occasions and that Mother had done "good things" with the children in his presence but that he did not know what she had done when he was not present. The children's guardian ad litem testified that she believed the court should terminate the rights of all three parents. She also testified that the youngest two children had no physical or mental conditions that would "hinder them from being adopted" and that she did not see "any problem" with finding permanent placements for all the children even though none of them were yet in their "forever home."

**DISCUSSION**

To terminate a parent's rights to her child, the Department must prove by clear and convincing evidence that she engaged in conduct that amounts to at least one statutory ground for termination pursuant to section 161.001 and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is proof "that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). The factfinder, "having full

7

opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses," and we therefore defer to the factfinder's decisions. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we do not ignore undisputed evidence contrary to the finding but otherwise assume the factfinder resolved disputed facts in favor of its finding. *Id*. at 630-31. In reviewing factual sufficiency, we weigh the disputed evidence contrary to the finding against all the evidence favoring the finding and ask whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.*

Termination of the parent-child relationship may be ordered under subsection (D) if clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," Tex. Fam. Code § 161.001(b)(1)(D), and under subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(b)(1)(E). The Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Subsection (D) focuses on the child's environment, while subsection (E) focuses on the parent's conduct and asks whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.).

8

We consider a trial court's finding on best interest in light of the factors set out in *Holley v. Adams*: the child's wishes, if appropriate given the child's age; her emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the child's best interest; plans for the child's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

### Statutory-predicate grounds

As for statutory-predicate grounds supporting termination of parental rights, our review of the record leads us to conclude that the evidence was legally and factually sufficient to support the trial court's finding that Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. *See* Tex. Fam. Code § 161.001(b)(1)(E). Evidence showed that Mother had used marijuana while pregnant, physically assaulted and injured some of the children, used excessive physical discipline with the children, left illegal drugs in the children's reach and used drugs in their presence, been previously convicted for causing injury to one of her children, absconded from another state with the children without notifying the state's child-welfare agency as she was

9

required to do, exhibited symptoms of mental illness, admitted she had mental-health needs but was not taking medications for them, tested positive for methamphetamine during the case and repeatedly refused to test during the case, failed to complete most of her court-ordered services, been only minimally cooperative during the FBSS period, refused to allow the children to attend therapy, failed to address the children's extensive special needs, and been incarcerated in the past and was currently incarcerated. Because the evidence is sufficient to support the court's finding under subsection (E), we need not consider whether the evidence also supports the findings under subsections (D) or (O). *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

*Best interests*

As for the best interests of the children, the trial court considered the above-cited evidence demonstrating that Mother had: physically abused one or more of the children on more than one occasion and in front of the other children, used illegal drugs in front of the children and while caring for them, failed to address her own mental-health issues or the significant special needs and behavioral issues of her children, and not demonstrated any significant progress on addressing the Department's serious concerns about her ability to safely care for her children and tend to their well-being for many years. The children had been improving with respect to their behavioral and special needs while in the Department's care, and the Department planned to find "forever homes" for the children via adoption. Weighing the evidence presented under the *Holley* factors and bearing in mind the trial court's role as factfinder, we conclude that

sufficient evidence supports the court's finding that termination of Mother's parental rights is in the children's best interest.[4] *See C.H.*, 89 S.W.3d at 27; *Holley*, 544 S.W.2d at 371-72.

## CONCLUSION

Having overruled Mother's issues, we affirm the trial court's decree of termination.

 

_____

Thomas J. Baker, Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   July 21, 2021

---

[4] We conclude so despite Mother's three arguments about "other relevant factors" beyond those expressly listed in *Holley* that purportedly weigh against termination: (1) potential placement of the children with a maternal aunt in Hawaii required the court to sua sponte order a home study on the aunt (however, Mother never suggested her sister as a placement option, and Father M. only did so about a month before trial; Mother cites no authority requiring or permitting the trial court to order such a study; and Mother did not complain about this issue to the trial court); (2) there had been no recommendations from the children's therapists since July 2020 about what would be in their best interest (however, the Department need not present evidence of all potential best-interest factors); and (3) the court interpreter, through whom Father M. testified, was not "certified" (however, neither Mother nor any other party objected to the lack of certification and instead affirmatively waived any such complaint).